Joyce HAAS et al.

v.

Patricia Roberts HARRIS et al.

Iola SALISBURY

v.

Patricia HARRIS et al.

Civ. A. Nos. 77–0235, 77–0244.

United States District Court,
D. Rhode Island.

Aug. 11, 1977.

Betsy Grossman, and Robert M. Sabel, of R.I. Legal Services, Newport, R. I., for plaintiffs in Civ. A. No. 77–0235.

David Reilly, and David Green of R.I. Legal Services, Providence, R. I., for plaintiffs in Civ. A. No. 77–0244.

Hiram C. Eastland, Jr., Dept. of Justice, Washington, D. C., Constance L. Messore, Providence, R. I., Asst. U. S. Atty., R. I., Berndt W. Anderson, Providence, R. I., for defendants in Civ. A. No. 77–0235.

Hiram C. Eastland, Jr., Dept. of Justice, Washington, D. C., Constance L. Messore, Providence, R. I., Asst. U. S. Atty., R. I., Joseph R. Palumbo, Jr., Newport, R. I., for defendants in Civ. A. No. 77–0244.

## OPINION

PETTINE, Chief Judge.

The above-captioned cases came on to be heard in consolidated proceedings on June 8, 1977. They arise from a three-way dispute among plaintiffs, tenants in federally subsidized housing (hereafter sometimes referred to as the tenants), defendant Secretary and various officials of the Department of Housing and Urban Development (hereafter referred to collectively as the Secretary), and defendants owner/developer/managers of the housing complexes where plaintiffs reside (hereafter sometimes referred to as the landlords). The landlords seek to impose a rent increase on plaintiffs, which must be approved by HUD. The tenants seek to enjoin the Secretary from approving this increase. The landlords, not surprisingly, oppose tenants' motion, but, in the case of defendant Kings Grant Co., suggest that the Secretary be ordered to pay an operating subsidy that will ease or eliminate any burden on the tenants that the increase would otherwise cause. The Secretary refuses to pay the subsidy and will approve the increases unless enjoined. She moves for dismissal or stay of these actions and for the denial of all relief to the tenants. For the reasons that follow, the Court concludes that a preliminary injunction must issue restraining the Secretary from assessing on plaintiffs and their class that portion of the proposed rent increase which would be covered by the operating subsidy. The Court further concludes that further proceedings must be stayed in these cases, pending definitive resolution of the issues involved by the United States Supreme Court in cases now before that tribunal.

A. Background

Kings Grant and Oxbow Farms, the housing developments where plaintiff tenants reside, are subsidized under section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (1970). As part of the subsidy scheme, section 236 landlords receive "production subsidies" whereby their mortgage interest payments are substantially reduced. In addition, another subsidy, known as a "deep subsidy", may be paid to landlords on behalf of certain tenants whose rental payments would otherwise exceed 25% of their adjusted income.

In spite of these two subsidies, housing costs to defendant landlords and rents to tenants have increased in recent years, due in part to steep increases in local property taxes and fuel and utilities costs. To remedy these problems, Congress, in 1974, authorized a further subsidy for section 236 project owners, known as an "operating subsidy", 12 U.S.C. §§ 1715z–1(f) and (g). Under the operating subsidy program, the Secretary is authorized to establish the initial cost of property taxes and utilities in section 236 projects (the "initial operating expense level") and to subsidize the increased local taxes and utilities costs that landlords incur over and above that figure so as to insure that these expenses are not responsible for driving rents up above 30% of tenants' incomes.

It is the operating subsidy that is at the heart of the present controversy. The Secretary has steadfastly refused to implement the operating subsidy, maintaining that the

decision whether to calculate and pay the subsidy is left entirely to her discretion. The courts that have thus far ruled on the matter have uniformly disagreed with this position, holding the subsidy to be mandatory and ordering the Secretary to implement it. *See, e. g., Underwood v. Hills*, 414 F.Supp. 526 (D.D.C.), *appeal pending*, (D.C. Cir.); *order stayed*, 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976) and cases cited therein. A definitive answer on this issue may be expected when the Supreme Court decides two cases raising the same legal issues as those raised in *Underwood, Abrams v. Hills*, 547 F.2d 1062 (9th Cir. 1976), *cert. granted sub nom. Harris v. Abrams*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, 45 U.S.L.W. 3763 (1977) and *Ross v. Community Services, Inc.*, 405 F.Supp. 831 (D.Md.1975), *aff'd mem.* 544 F.2d 514 (4th Cir. 1976), *cert. granted sub nom. Harris v. Ross*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, 45 U.S.L.W. 3763 (1977). In the meantime the Supreme Court has stayed Judge Pratt's order in *Underwood*, in which the Secretary was required to begin implementing the operating subsidy program on a nation-wide basis.

B. The Secretary's Motion to Dismiss or Stay

It is the Secretary's position that plaintiffs in this case are part of the nationwide class of tenants certified by Judge Pratt in *Underwood v. Hills*, 414 F.Supp. at 531, and that their claims were litigated, or could have been litigated, in *Underwood*. Accordingly, the Secretary argues, the present action should be dismissed or stayed by virtue of the doctrine of *res judicata*. Alternatively, the Secretary argues that she is entitled to summary judgment on plaintiffs' claim that her approval of the challenged rent increases is contrary to law.

Under ordinary circumstances, the Court would agree with the Secretary that the relief here sought is barred by principles of *res judicata*. Examination of the *Underwood* papers reveals that the *Underwood* plaintiffs argued two theories before Judge Pratt: 1) that the Secretary was obliged to implement the operating subsidy program and (2) that the Secretary was not permitted to pass along rent increases to tenants without taking into account the operating subsidies that she was required to implement. Judge Pratt gave summary judgment for the plaintiffs on the first claim, and did not rule on the second claim. As relief, Judge Pratt ordered implementation of the subsidy program nationwide. It was this order, involving as it did a significant expenditure of federal funds, that the Supreme Court stayed. The effect of the Supreme Court's action, of course, was to insure that either the tenants or the landlord, but not HUD, would bear the temporary burden of rent increases that HUD might approve, since there would be no operating subsidy to absorb the increases. The *Underwood* plaintiffs therefore had open to them a second line of attack: Judge Pratt's order, stayed by the Supreme Court, dealt only with the issue of whether the Secretary should pay the operating subsidy; it left undecided the issue of who—as between landlord and tenant—should bear the burden of the rent increase while the subsidy question awaited final resolution.[1] There is no indication that the Supreme Court was presented with, or purported to decide, this question. Decision of this question would have required a ruling on the *Underwood* plaintiffs' second claim—that the Secretary could not pass along rent increases without considering the effect of the operating subsidy.[2] The *Underwood*

1. The *Underwood* plaintiffs did argue to the Supreme Court that it would be burdensome to them as tenants to pay the rent increases that would result from a stay. But this is a far cry from arguing that there was another legal theory that would protect tenants from rent increases without the necessity of implementing, pending completion of the appeal, a massive nationwide subsidy program.

2. Obviously this issue raised quite different considerations in terms of whether to grant or deny the *Underwood* plaintiffs equitable relief or to stay such relief if granted. It is one thing to say that the Secretary is obliged to implement a multi-million dollar subsidy program, and quite another to decide that she may not approve certain rent increases while the subsidy issue is being resolved. The first remedy

plaintiffs, however, did not press this claim by seeking further relief from Judge Pratt.

 Ordinarily, this failure to exhaust alternative remedial possibilities would bar subsequent litigation on the same issue. *See, e. g., United States v. Munsingwear*, 340 U.S. 36, 40–41, 71 S.Ct. 104, 95 L.Ed. 36 (1950). However, because *Underwood* was a class action, the normal rules of *res judicata* are subject to a limitation, imposed by the Due Process Clause, that requires that the interests of absent members of the class, plaintiffs here, have been adequately protected by those representing the class in order for principles of *res judicata* to apply to them. *See Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 691, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); *Hansberry v. Lee,* 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940). *See also Berman v. Narragansett Racing Association,* 48 F.R.D. 333, 337–38 (D.R.I.1969). This means that, for the plaintiffs in this case to be bound by *res judicata* as members of the *Underwood* class, it must appear that the *Underwood* plaintiffs "vigorously and tenaciously" protected their interests at every stage of the *Underwood* litigation. *Gonzales v. Cassidy,* 474 F.2d 67,. 75 (5th Cir. 1973); *Lewis v. Phillip Morris, Inc.,* 419 F.Supp. 345, 352 (E.D.Va.1976).

 This Court cannot say that this test has been met in this case. Clearly, every debatable judgment call by attorneys in class actions will not dispense dissatisfied class members from the bar of *res judicata.* Such a rule would defeat one of the important purposes of class actions. But this is not the ordinary case. The *Underwood* attorneys, who had successfully sought nationwide relief for their class, were placed in a difficult position when the Supreme Court stayed Judge Pratt's order in their favor. For the only relief available for class members—an injunction against assessment of rent increases—would necessarily depend upon a balancing of equities on an individualized basis between tenants and

their landlords in each eligible housing project throughout the country. Indeed, it is difficult to see how this relief could have been sought without breaking up the class. In any case, it was not sought on behalf of plaintiffs in this case. This failure to seek on their behalf the only means of relief available after the Supreme Court's stay of Judge Pratt's nationwide relief deprived plaintiffs in these cases of the vigorous representation to which they are entitled and leaves them free to seek the relief in the instant action that could have been sought in *Underwood. Cf. Gonzales v. Cassidy,* 474 F.2d at 76 (failure to take appeal for benefit of absent class members precludes application of *res judicata* to their claims).

 As an alternative to her *res judicata* argument, the Secretary urges that she is entitled to summary judgment on the grounds that the Secretary's decision to increase plaintiffs' rents is committed entirely to her discretion and not reviewable in this Court. *See* 5 U.S.C. § 701(a); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir. 1970). The Court cannot agree. The gravamen of plaintiff's complaint in the present case is that the Secretary, in approving the challenged rent increase, has ignored her plain statutory duty to consider the operating subsidy and its effect in passing upon the requested increase. The reviewability of such conduct was left open by the *Hahn* court, *see* 430 F.2d at 1251, and this Court has recently held that *ultra vires* actions by the Secretary are indeed subject to judicial review. *Silva v. East Providence Housing Authority,* 423 F.Supp. 453, 460 n.9 (D.R.I. 1976). Obviously, conduct in violation of a clear statutory duty is equally subject to judicial scrutiny, and the Secretary is not entitled to summary judgment on this theory.

 As an alternative to dismissal or summary judgment, the Secretary urges that the Court stay proceedings in this case

---

involves an irretrievable commitment of substantial public funds; the cost of the second remedy would be spread among the landlords

eligible for operating subsidies, who could perhaps recoup their losses if the *Underwood* plaintiffs ultimately prevail.

pending definitive resolution of the operating subsidy question by the Supreme Court. The Court agrees that such a course of action is advisable in the interest of judicial economy. See *Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936); *Taunton Gardens Co. v. Hills,* 557 F.2d 877, No. 76–1558 (1st Cir. May 31, 1977); *Lefort v. Hills,* No. 76–0286 (D.R.I. November 19, 1976) [unpublished opinion of Day, J.]

The only question that remains, therefore, is whether a preliminary injunction should issue *pendente lite,* either at the behest of plaintiff tenants or of defendant landlords. In accordance with the findings of fact and conclusions of law that follow, the Court is of the opinion that plaintiff tenants have established their right to a preliminary injunction but defendant landlords have not.

C. Findings of Fact

1. Kings Grant Apartments is a 156-unit apartment complex in North Kingstown, Rhode Island, subsidized under section 236 of the National Housing Act, 12 U.S.C. § 1715z–1.

2. Oxbow Farms is a 302-unit housing project in Middletown, Rhode Island, subsidized under section 236 of the National Housing Act, 12 U.S.C. § 1715z–1.

3. Plaintiff Joyce Haas, with her two minor children, has resided in a three-bedroom apartment at Oxbow Farms since 1971. Her rent was increased, in February, 1976, from $153 to $167, the rent she is presently paying. At all times relevant hereto, she has paid, and continues to pay, in excess of 30% of her adjusted monthly income for rent.

4. Plaintiff Iola Salisbury, is a 69-year-old individual who has resided at Kings Grant Apartments since February, 1977. Plaintiff Salisbury occupies alone a one-bedroom apartment for which she currently pays $175 per month in rent, which is approximately 75% of her income. Plaintiff Salisbury's sole source of income is the $230 per month she receives from the Social Security Administration. Plaintiff has no as-

sets of substantial value. At all times relevant hereto, she has paid and continues to pay in excess of 30% of her adjusted monthly income for rent.

5. Plaintiff Ethel Arruda is a 64-year-old individual who has resided at Kings Grant Apartments since January, 1977. Plaintiff Arruda occupies alone a one-bedroom apartment for which she currently pays $175 per month in rent, which is approximately 79% of her income. Plaintiff Arruda's sole source of income is the $219 per month which she receives from Social Security Administration. Plaintiff has no assets of substantial value. At all times relevant hereto, she has paid and continues to pay in excess of 30% of her adjusted monthly income for rent.

6. Defendant Patricia Roberts Harris, in her official capacity as Secretary of the United States Department of Housing and Urban Development (HUD), is charged with responsibility for administration and enforcement of all of the functions and duties of HUD, including those under the National Housing Act, 12 U.S.C. §§ 1701 to 1750b (1970); and under the Housing Act of 1937, 42 U.S.C. §§ 1401 to 1490g (1970).

7. Defendant Sirrouko Howard is the Director of the Providence Area Insuring Office of HUD; as such, he is assigned the enforcement and administrative responsibilities of HUD for the National Housing Act, 12 U.S.C. §§ 1701 to 1750b, and for regulations and policy promulgated pursuant thereto, for the State of Rhode Island, including the Newport/Middletown area.

8. Defendant Oxbow Associates is a New York limited partnership, whose general partner is Ronald Nicholson, of New York, New York. Oxbow Associates is the beneficial owner and mortgagor of Oxbow Farms.

9. Defendant Bay Management Corporation is a New York corporation, of which Ronald Nicholson, of New York, New York, is the president. Its principal place of business is in New York, but it also has an office in Woonsocket, Rhode Island, and a management office in Middletown, Rhode Island, at Oxbow Farms.

10. Defendant Bay Management Corporation entered into a management agreement with defendant Oxbow Associates, which agreement was subject to HUD approval, whereby it became the agent for Oxbow Associates and solely responsible for the management of Oxbow Farms.

11. At all times relevant hereto, Bay Management Corporation has acted as the agent for Oxbow Associates in its management of Oxbow Farms, and in its dealings with HUD relative thereto.

12. Defendant Kings Grant Company is a Massachusetts limited partnership, whose general partners are John R. Gallagher III, and Walter K. Winchester. Kings Grant Company is the equitable owner/mortgagor of Kings Grant Apartments, a 156-unit development in North Kingstown, Rhode Island.

13. Defendant, State Street Development Management Corporation is a Massachusetts corporation doing business in Rhode Island. By contract executed with Kings Grant Company, with the approval of HUD, defendant State Street is responsible for the management of Kings Grant Apartments.

14. Plaintiffs Salisbury and Arruda represent tenants in approximately 52 other units at Kings Grant Apartments who are now paying in excess of 30% of their adjusted monthly income for rent, or who will be doing so if the rent increase approved by HUD in March, 1977, is implemented. The class of which plaintiffs are representative is so numerous as to make joinder of all members in this action impracticable.

15. Plaintiff Haas represents tenants in approximately 137 other units at Oxbow Farms who are now paying in excess of 30% of their adjusted monthly income for rent, or who will be doing so if the rent increase, approved by HUD in March, 1977, is implemented. The class of which plaintiff is representative is so numerous as to make joinder of all of the members in this action impracticable.

16. Defendants have acted on grounds generally applicable to the members of plaintiffs' class by attempting to pass along to the members of the class increased costs of taxes and utilities in the form of rent increases that would require plaintiffs and their class to pay in excess of 30% of their adjusted monthly incomes for rent. Plaintiffs' claims are typical of the claims of the members of the class.

17. Plaintiffs will adequately protect the interests of the other members of the class. There is no evidence of any conflict between plaintiffs and the other members of the class.

18. Kings Grant Company, as owner of Kings Grant Apartments, has qualified for operating subsidy payments since February 18, 1975. 12 U.S.C. § 1715z–1(g). The sum of the cost of utilities and local property taxes as of March 28, 1977 for the Kings Grant Apartment project would have exceeded the initial operating expense levels for the project if the Secretary had established such levels. The imposition of the HUD approved rent increase would cause the rent paid by approximately 76 tenants (or approximately 49% of the units in the project) to exceed 30% of those tenants' adjusted gross incomes. The increase in the cost of utilities and local property taxes has been reasonable and comparable to cost increases affecting other rental projects in the relevant community.

19. Oxbow Farms is eligible for operating subsidies, in that the sum of the cost of utilities and local property taxes would have exceeded the initial operating expense level, had the Secretary established the initial operating expense level. The increase in utility costs and local property taxes has been reasonable, and comparable to cost increases affecting similar rental projects in the area. Some tenants are paying in excess of 30% of their adjusted monthly incomes for rent, and more will be required to do so under the rent increase approved by HUD on March 29, 1977.

20. On March 31, 1977, Oxbow Associates submitted a request for operating subsidy relief. Said request was denied by HUD; no alternative assistance was provided or suggested.

21. HUD has refused to implement any portion of the operating subsidy program, as regards Kings Grant Apartments, including the establishment of an initial operating expense level, or even determining if Kings Grant Apartments are eligible for said subsidies.

22. Kings Grant Company has orally applied for these operating subsidies, but HUD has not provided a vehicle for Kings Grant Company to apply formally.

23. Pursuant to the regulatory agreement entered into with HUD, Kings Grant Company has agreed to charge the tenants residing in the Kings Grant Apartments only those rentals approved by HUD.

24. On or about February 25, 1977, the Kings Grant tenants learned that Kings Grant Company was submitting an application to HUD for permission to increase rents at Kings Grant Apartments, because of increased maintenance and operating expenses, including increased costs of property taxes and utilities.

25. On or about March 31, 1977, Kings Grant Company and State Street Development Management Corporation notified the Kings Grant tenants that HUD had approved a rent increase, to be effective May 1, 1977. A significant percentage of the approved increase was in fact directly attributable to increases in the costs of utilities and/or local real estate taxes.

26. On or about March 31, 1977, plaintiffs Salisbury and Arruda were notified that their rent would be increased from $175 to $190 per month on May 1, 1977.

27. The total cost of utilities and local real estate taxes incurred by Kings Grant Apartments has increased between the summer of 1974 and the present, and is projected to increase further during the calendar year 1977.

28. On March 29, 1977, defendant Sirrouko Howard approved an increase of approximately 15% in basic rents at Oxbow Farms. This increase was requested by the project management because of increases in operating expenses. A significant percentage of these increases in operating expenses

was attributable to increases in the costs of local property taxes and utilities. The actual percentage attributable to these cost increases has not been calculated with respect to Oxbow Farms.

29. On March 30, 1977, plaintiff Haas and other tenants at Oxbow, were notified that an increase in rents had been approved. Plaintiff Haas was told that her rent would be increased to $192 per month as of May, 1977. This amount would exceed 40% of her adjusted monthly income.

30. Prior to the rent increase approved by HUD on March 29, 1977, the last consideration and approval by HUD of a rent increase for Oxbow Farms had been in October, 1974. That rent increase was implemented on February 1, 1976, and was in significant part due to increases in taxes and utilities.

31. Since the 1974 rent increase, the annual costs of property taxes and utilities for Oxbow Farms have increased more than $50,000. These costs are projected to increase further in fiscal year 1977.

32. If the rent increase for Oxbow Farms approved by HUD on March 29, 1977 were to be implemented for all tenants, the additional income to the project to be generated on a monthly basis would be approximately $7,000, which is equivalent to the monthly deficit now experienced by the project.

33. The rent increase at Oxbow Farms is already being assessed upon those tenants whose income does not now exceed 30% of their income for rent, and/or will not exceed 30% of their income under the increased schedule of rents. These tenants number about 45% to 55% of the project total.

34. On a monthly basis, Oxbow Farms is already collecting at least 45% of the March 29, 1977 increase.

35. The rent increase for the Kings Grant Apartments approved by HUD was in the total amount of $2,530 per month. Kings Grant Company is entitled to operating subsidy payments from the Secretary in the sum of $759 per month to offset that

amount of the rent increase which is attributable to increased utility costs and local property taxes and which would require tenants to pay rents in excess of 30% of their adjusted gross income. With respect to the balance of the rent increase, Kings Grant Company is entitled to receive $867 per month in rent supplement payments from HUD and $787 per month from tenants to offset that amount of the rent increase for which no operating subsidy funds may be provided by the Secretary.

36. Defendants Oxbow Associates, Bay Management Corporation, Kings Grant Company and State Street Development Management Corporation will suffer no irreparable harm if that portion of the scheduled rent increase directly attributable to increases in utility costs and local real estate taxes is, stayed.

37. Plaintiff Haas and her class will suffer irreparable harm if a rent increase is assessed against them, in that:

a) Decent, safe, and sanitary housing at a rent not exceeding 30% of plaintiff class members' income is unavailable in the Newport/Middletown/Portsmouth area.

b) Plaintiff, and other members of her class will only be able to pay the rent at the increased rate if they sacrifice other bare necessities of life.

c) Plaintiff, and other members of her class, confront the possibility of eviction if they fail to pay the rent at the increased rate.

38. If the rent increase as approved by HUD is not stayed, plaintiffs Salisbury and Arruda and their class will suffer irreparable harm, such that future relief will be useless in that:

a) Decent, safe, sanitary and affordable housing at a rent not exceeding 30% of the tenants' income is unavailable in the North Kingstown/East Greenwich area.

b) Plaintiffs, and other members of their class, will only be able to pay the rent at the increased rate if they sacrifice other bare necessities of life.

c) Plaintiffs, and other members of their class, confront the possibility of eviction if they fail to pay the rent at the increased rate.

39. Requiring the Secretary to calculate the amount due to defendant landlords under the operating subsidy program will cause the Secretary some administrative inconvenience.

D. Conclusions of Law

1. The named plaintiffs are adequate representatives of the class herein certified consisting of all tenants at Oxbow Farms and Kings Grant now in occupancy and all persons who become tenants at Oxbow Farms and Kings Grant during the pendency of this litigation who are or will as a result of rent increases approved by the Secretary be paying in excess of 30% of their adjusted monthly income for rent.

2. The Court has jurisdiction in these cases under 28 U.S.C. §§ 1331, 1337, and 1361 (1970); there is an actual controversy between the parties and the Court may thus grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 (1970).

3. Plaintiffs have no adequate remedy at law.

4. It is settled as between the parties before the Court that the Secretary is without discretion to refuse to implement the operating subsidy. *Underwood v. Hills,* 414 F.Supp. 526 (D.D.C.1976).

5. It is probable that, upon final hearing, plaintiffs will establish that the Secretary violated her statutory duty in failing to take into account the operating subsidies mandated by 12 U.S.C. § 1715z–1(f)(3) and amounts payable thereunder in determining the cost of "operating the project" and fixing the basic rental charge as provided in 12 U.S.C. § 1715z–1(f)(1). *Lefort v. Hills,* C.A. No. 76–0286 (D.R.I. November 19, 1976), at 24–25 [unpublished opinion of Day, Senior District Judge].

In reaching this conclusion, the Court is aware of the statement of Judge Harvey in the *Ross* case, 396 F.Supp. 278, 283, that the Secretary need not necessarily act upon an operating subsidy request before approving

a rent increase. *Accord, Johnson v. HUD,* Case No. 76–979–CIV–JLK (S.D.Fla. January 20, 1977), at 3. However, as Judge Harvey also points out, the Secretary must act upon the subsidy request within a reasonable time. In the present case, the Secretary has never ruled on whether these landlords are eligible for operating subsidies, based on their increased operating costs, although she has never given any indication that they would not be eligible for operating subsidies if the operating subsidies program were implemented. Rather, the Secretary has stood upon her blanket pronouncement that she is not obliged to implement the subsidy program at all. In view of the unlikelihood that this view will ultimately prevail, *see Underwood,* 414 F.Supp. at 531 and cases cited; *but see Cottonwood Park Tenants Association v. HUD,* Civ. No. 77–2059 (D.Kan., April 29, 1977), at 11, this Court can only agree with Judge Day that "it would . . . be most unfair . . . for defendants to assess plaintiffs the instant increases passing onto them expenses which should have been and should be subsidized." *Lefort v. Hills, supra,* at 21.

In the ordinary case, this Court would be powerless to interfere with the Secretary's exercise of her discretion to fix rents. *See Hahn v. Gottlieb,* 430 F.2d at 1246. But the Secretary's "discretion is not absolute and certainly it may not be exercised in a fashion that ignores HUD's overall responsibilities under various congressional enactments to further national housing policy", *Kent Farm Co. v. Hills,* 417 F.Supp. 297, 302 (D.D.C.1976). *See Hahn v. Gottlieb,* 430 F.2d at 1251. *See also Mandina v. Lynn,* 357 F.Supp. 269, 276 (W.D.Mo.1973). In this case there can be no doubt that Congress' purpose in amending the Housing Act to include operating subsidies was "to prevent excessive rent increases" which resulted in lower income tenants being required to pay a disproportionate amount of their incomes for their apartments. S.Rep. No. 93–693, 93rd Cong., 2d Sess. (1974); [1974] U.S.Code Cong. & Admin.News pp. 4273, 4303; *see also* S.Rep. No. 94–749, 94th Cong., 2d Sess. (1976), [1976] U.S.Code

Cong. & Admin.News pp. 1885, 1894. The Supreme Court has ruled that the Secretary need not execute the *Underwood* order and implement the statute forthwith; this does not mean that the Secretary is free to pass along rent increases to tenants pending resolution of the *Underwood* issues, in derogation of statutory policy.

6. Issuance of a preliminary injunction restraining assessment of the rent increase is necessary to preserve the *status quo* while this case is pending.

7. Issuance of the preliminary injunction sought by plaintiffs is in the public interest.

8. The preponderance of the equities favors issuance of a preliminary injunction in favor of plaintiff.

9. Defendant Kings Grant Company has failed to show sufficient harm to warrant issuance of a preliminary injunction ordering the Secretary to begin payment of the operating subsidy in view of the fact that such an order would run counter to the purposes of the stay granted by the Supreme Court in *Underwood v. Hills. See Taunton Gardens Co. v. Hills,* 557 F.2d 877, at 879, No. 76–1558 (1st Cir. May 31, 1977).

### E. Conclusion

In the unique factual and legal circumstances of this case, plaintiffs have established that they are entitled to a preliminary injunction to avoid irreparable harm and to preserve the *status quo.* Relief ordered by the Court will be no broader than absolutely necessary, so as to avoid unnecessarily burdening the landlords, and to comply with the teachings of *Hahn v. Gottlieb.* Accordingly, the injunction will be limited to an order restraining defendants from assessing named plaintiffs and their class any portion of the rent increases approved on or about March 29, 1977 attributable to increases in local property taxes and utilities costs or of any future rent increases attributable to increases in local property taxes and utilities costs to the extent that such rent increases will raise any tenant's rent above 30% of the tenant's adjusted

income, until such time as the Secretary satisfies her legal duty of taking the operating subsidy program into account in exercising her discretion in passing on rent increases.

In light of the Court's denial of the Secretary's summary judgment motion, her motion to stay discovery pending decision of that motion is denied as moot.

Counsel for plaintiffs will prepare an order in accordance with this memorandum.